

**FILED**

Jun 27 2016, 6:06 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Debra A. Mastrian
Catherine E. Sabatine
SmithAmundsen LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
REVIEW BOARD

Gregory F. Zoeller
Attorney General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

Employer,

*Appellant*,

v.

Review Board of the Indiana
Department of Workforce
Development and Employee,

*Appellees*.

June 27, 2016

Court of Appeals Case No.
93A02-1512-EX-2182

Appeal from the Review Board of
the Indiana Department of
Workforce Development

Case No.
15-RB-1838

**Brown, Judge.**

[1] M.F. ("Employer") appeals a decision of the Review Board of the Indiana Department of Workforce Development (the "Board") in favor of C.G. ("Claimant") with respect to Claimant's claim for unemployment benefits. Employer raises one issue which we restate as whether the Board erred in concluding that Claimant was not discharged from her employment for just cause. We reverse.

## Facts and Procedural History

[2] Claimant worked as a full-time receptionist for Employer, a health care provider, until August 4, 2015, when her employment was terminated. She filed a claim for unemployment benefits, and in September 2015, a claims deputy with the Indiana Department of Workforce Development ("DWD") determined that she had been discharged for just cause due to a work-related breach of duty.

[3] Claimant appealed, and a hearing was held on October 5, 2015, before an administrative law judge ("ALJ"). Employer testified that his business is a medical practice and that Claimant was discharged because "[s]he had multiple issues such as incomplete job duties, data entry problems that were incorrect and this happened repetitively. As well as, disruption amongst other personnel with (Inaudible)." Transcript at 5. When asked if there was one incident that led to her discharge, Employer testified that "I think it was a culmination. So, you will see in the written section that there was . . . a progressive number of letters written that finally culminated in the discharge." *Id.* When asked about the last thing that happened, he testified "the major thing was that we had

multiple patient complaints about not billing insurance correctly," "[i]n other words, the insurance cards, which are presented at the time of entry into the office, the numbers on the insurance cards were incorrectly entered," "[a]s well as, incorrect insurance policies were entered," "we have multiple persons within the office that have to deal with these insurance cards" and "[t]hey are all able to enter it correctly, but unfortunately that was kind of the final straw that [Claimant] was not able to correctly enter those," and "that resulted directly in harm to the business by losing payments for surgeries and office visits." *Id.* at 5-6. When asked "was [Claimant] warned," Employer responded: "Yes, multiple times. And, just as a correlation, she has peers in the office doing the same types of duties and they were all able to perform. She was the only one who was not performing." *Id.* at 6. Employer also testified that "the general gist of this is that over . . . a long period of time myself and the office staff attempted to write [sic] [Claimant's] low performance by encouragement, by teaching, by example," that "despite all of that, we have numerous different issues that were given rise to office turbulence and harm," that "it was not corrected," and that, "therefore, there was a long track record which culminated in this discharge. It was not an impulsive decision by any means. It was a slow but gradual realization that it was not working." *Id.*

[4] The ALJ admitted into evidence a number of letters and notes submitted by Employer related to Claimant's job performance. A letter to Claimant dated July 25, 2012, stated "[p]lease put the co-pay amount on the fee slip for each patient in the upper right corner" and "[t]hank you so much!" Exhibits at 28.

A note dated August 6, 2012, states "[a]dvised [Claimant] to schedule . . . patients as soon as possible – advised a month is too long." *Id.* at 27. A note dated December 20, 2012, to Claimant states "[w]hen patients have Sagamore, be sure to put in group number with a space and then the SAG number such as: . . ." and "[t]hank you." *Id.* at 24. A note dated January 15, 2015, to Claimant states "[p]lease update these charts for demographics as [illegible] are not getting the bills to patients," "this is dropping our collections despite having done our . . . work," and "Thanks." *Id.* at 20. A note dated February 18, 2015, titled "Meeting / performance / improvements," states "[d]iscussed wide range of issues and also job description" and listed eight numbered items, including in part: "teamwork/helping others at any task," "[n]eed to collect co-pay," "[c]harts incompletely put together," "[r]egistration of insurance cards not complete," "[i]ncomplete e-mails," "[n]o homework on job," "[c]heck insurance card for exact type & enter properly," and "[u]pdated job description list." *Id.* at 19. A note dated April 10, 2015, states "[d]iscussed with [Claimant]," "[c]ontinued problems with inaccurate insurance computer entries," "[t]hus, we don't get paid or the corrective steps are taken by other office staff," "[t]his decreases revenue & increases expenses," and "[h]ave again asked to inspect the insurance cards to get the correct info into the computer." *Id.* at 18.

[5] A letter from Employer to Claimant dated May 7, 2015, which contains a written note that it was given to Claimant May 14, 2015, by Employer's business manager and reviewed with her, states "[a]s a reminder, we would

need to have an accurate scheduling with patients for their office visit coordinated with hearing testing," that "[t]hese requirements are listed at the end of the office note," that "[i]f they are not scheduled appropriately then great confusion arises and patient frustration becomes an issue," that "[y]ou are responsible for pulling and prepping the charts," and "[t]hank you very much for your help in these office matters! I appreciate your contributions!" *Id.* at 17. A letter from Employer to Claimant dated June 18, 2015 states, "[a]s per our previous conversations, please refrain from overriding the new patient office slots until the day prior to the office time," "[a]t this present time we already have overrides for July and August," "[w]e need to keep those slots open for new patients," "[a]dditionally, we are seeing patients until 5 p.m.," and "[p]lease make a note of this. Thank you for your help!" *Id.* at 15. A letter from Employer to Claimant dated June 25, 2015, states "[a]s per our telephone conversation there have been some issues that have arisen once again that are impeding the front office from properly progressing during the business day," "[s]pecifically, please enter all insurance demographics into the charts and Athena system prior to the patients being seen by me," "[i]f this does not happen it creates great confusion," "[a]dditionally, please make sure that the total cash is verified and labeled," "[l]astly, please keep a cordial and polite conversation going with others in the front office, so that impersonal friction does not arise," and "Thank you very much for your help in these matters!" *Id.* at 14. A note dated July 14, 2015, indicates "Reviewed w/ [Claimant]. Pulled charts form [sic] shelf w/ her to confirm demos not entered at check in." *Id.* at 16.

[6]     The ALJ questioned Employer's business manager and the following exchange occurred:

> Q [ALJ]:     The most recent warning or corrective notice that I see is from June of this year. Was any other warning or corrective action issued to [Claimant] after June?
>
> A [Employer's business manager]:     Verbal. We did a lot of verbal between me and her. Then, I know [Employer] had multiple conversations with her on this. And, then, we obviously offered her, you know, to ask questions if she wasn't sure to put the accounts on hold.
>
> Q:     So, again, my question is was any other . . .
>
> A:     (INAUDIBLE)
>
> Q:     . . . correction or warning issued to [Claimant] after the June 23, 2015 . . .
>
> A:     Correct. Me and her . . .
>
> Q:     . . . letter.
>
> A:     . . . communications about it at least weekly.
>
> Q:     Was she ever told that her job was in jeopardy?
>
> A:     Yes.
>
> Q:     When?
>
> A:     During the conversations (INAUDIBLE) we said, you know, that this, you know, a jeopardy that we won't be able to continue to employee [sic] people if you can't pay.
>
> Q:     Was she told that her job was in jeopardy because of her job performance?
>
> A:     You're saying like somebody came out straight and said if you do this again you're going to be fired? No.
>
> Q:     Yes.
>
> A:     I have not.

Q:     Alright.  I, I don't have any other specific questions for you, [Employer's business manager].  Is there anything else, [Employer], is there anything else you'd like to question [Employer's business manager] about?

A:     No, I took under consideration that the warning would be implied.  That if it didn't get corrected that it would not, you know, that you wouldn't have a job.  And, I did make that statement multiple times to [Claimant] and our other employees in here.

Q:     Thank you, [Employer's business manager].  [Employer]? . . .  Would you like to question [Employer's business manager] on any other areas that I didn't cover?

[Employer]:  I think she covered her part fine.

Transcript at 9-10.

[7]     Claimant indicated that she did not understand that her job was in jeopardy for her work performance.  She testified that she did not feel the documents submitted by Employer were truthful.  She testified that "[i]t was never a warning to me that my job was in jeopardy," that "[t]hey and [Employer's business manager] would say it to everyone in the office," that "[s]he never warned me directly and said your job is in jeopardy.  That you are going to be fired," that "[t]hat was never stated to me," that "the documents to me are just for him to build a case," "such as today to say that this was, this did happen and we did tell her that," and that "[s]ome of these documents I've never even seen before." *Id.* at 11.

[8]     Claimant further testified that she worked for the company for sixteen years, that Employer "came in after . . . approximately five years," that she worked

under him and there was never a problem with her doing her job, that in the last year of working for Employer she was overloaded with an abundant amount of work, that she "was the only one that was doing it. Checking in, checking out, taking copays, entering demographics, filing, prepping the charts," that she "was doing all of the front office work," that she felt like Employer "did that to squeeze [her] out" and "[t]o make [her] quit," and that, "when he saw that wasn't working he decided to go to another level." *Id.* at 12. Claimant testified that Employer implemented a new software system which required input of insurance information, that she did that, and that "some of the insurances I did not get and that's what he used to terminate me," but that she "never talked to [Employer] multiple times about [her] job." *Id.* She also testified that, when she asked Employer's business manager about insurances, "she could never help [her]," that the manager "would always send [her] to [] another girl that worked in the office. And, sometimes she couldn't get it either," that "therefore, she would implement the insurances and I would go to her on numerous occasions to enter the insurances for me . . . because she was supposed to be the one that's going over the insurances and verifying insurances and making sure they were correct," and that she did not agree with the different statements that were made by Employer and Employer's business manager. *Id.* The ALJ asked Employer if he had any questions for Claimant, Employer asked Claimant how she can state this was made up when there is objective evidence that shows that she did not perform, and Claimant stated: "I wasn't aware that I was supposed to be saying that these documents didn't show that I did it. [] I asked you for training. You never trained me" and

"[y]ou told me to train myself. And, that you were not going to give me any training. And, I entered most of those insurances correctly. The firing and the termination of me was not justice. There's no justice with it." *Id.* at 13.

[9] The ALJ issued a decision on October 9, 2015, reversing the deputy's determination and finding that Employer did not have just cause to discharge Claimant. The ALJ's decision provided in part:

> **FINDINGS OF FACT**:
>
> Employer operates as a medical practice. Claimant began working for Employer on April 1, 2011 as a receptionist. Employer discharged Claimant on August 4, 2015 for unsatisfactory work performance, specifically, issues with gathering patient demographic information and billing medical insurance companies for services provided.
>
> Employer provided Claimant with notes on work to be done, requests to update patient information, reminders, and instructions on tasks. Some of these notes are addressed to Claimant along with other co-workers. The most recent letter regarding direction on Claimant's work is dated June 25, 2015, and ends with "Thank you very much with your help in these matters!" A June 18, 2015 memo to Claimant reminding Claimant of issues with patient scheduling ends with "Please make a note of this. Thank you for your help!" On May 7, 2015, [Employer's] memo to Claimant reminding her of a different scheduling matter includes, "Thank you very much for your help in these office matters! I appreciate your contributions!" These notes and memos had been issued to Claimant and other employees from June 2013 to June 2015. [Employer] and [Employer's business manager] met with Claimant in February 2015, [Employer] met with Claimant in April 2015, and [Employer's business manager] met with Claimant in July 2015,

all to provide Claimant with direction, reminders, and instructions regarding her work tasks.

At no time did Employer inform Claimant that if she continued to make errors in updating patient demographics or in insurance billing that her employment would be terminated. On August 4, 2015, Employer discharged Claimant for unsatisfactory work performance.

**CONCLUSIONS OF LAW**:

* * * * *

In the instant case, Employer had been writing memos, notes, and reminders to Claimant since June 2013. In May and June of 2015, memos to Claimant from [Employer] reminding her of scheduling tasks and updates to patient demographics included language thanking her for her contributions to the office rather than warning her that her position was in jeopardy. The [ALJ] concludes that a reasonable employee of Employer would not have understood that Claimant's performance had violated a duty or that Claimant was subject to discharge for her job performance. Employer did not have just cause to discharge Claimant as defined by Ind. Code Ann. 22-4-15-1.

Exhibits 29-31.

[10] Employer appealed the ALJ's decision and argued that Claimant was repeatedly counseled about her job performance and that Claimant's unsatisfactory job performance was a breach of her duties to Employer. On November 17, 2015, the Board entered a decision which affirmed the ALJ's decision and adopted and incorporated by reference the ALJ's findings of fact and conclusions of law.

*Discussion*

[11]    The issue is whether the Board erred in concluding that Claimant was not discharged from her employment for just cause.  Employer maintains that the Board's decision is unreasonable and contrary to law because the evidence established that Claimant repeatedly failed to perform her job responsibilities properly and follow Employer's instructions, had been informed about the importance of entering accurate patient demographic and insurance information and prepping patient charges on a number of occasions, and was given multiple chances to correct her deficiencies.  Employer further argues that, even if the manager did not explicitly inform Claimant that her job was in jeopardy, explicit notice is not required where, despite repeated correction, an employee demonstrates a pattern of substandard work performance.  Employer also argues that a reasonable person would not conclude that Claimant's repeated mistakes, errors, refusal to follow instructions, and inability to perform her job duties should be overlooked or ignored because Employer occasionally thanked her for her services.

[12]    The Board asserts that Employer never told Claimant she would be subject to discharge if she continued making mistakes, that for more than two years Employer chose to inform Claimant of her mistakes and at the same time thank her for her efforts, and that Employer's business manager acknowledged that Claimant was never explicitly told that her job was in jeopardy.  The Board argues that no warning could be implied from Employer simply correcting Claimant without providing any hint that her job was at stake, that "[g]iven this

pattern, a reasonable employee would believe that Employer was willing to tolerate mistakes and would simply continue bringing the errors to [Claimant's] attention," and that the notes ending with "Thank you!" show that Employer "wanted to soften the message contained in the list of corrections instead of confronting [Claimant] with a warning about her performance." Appellee's Brief at 10. The Board also argues that Employer's general theory is that poor performance alone is a breach of duty providing just cause for discharge and that, unlike in cases cited by Employer, there is no evidence that Claimant had a poor attitude, was defiant, rude, confrontational, or uncooperative, disliked the work, or simply refused to improve.

[13] In reply, Employer argues that an employer is not required to issue a warning prior to discharging an employee in order for just cause to exist, that just cause exists when an employee breaches a duty in connection with work which is reasonably owed to the employer or refuses to obey instructions, and that Claimant's continuous poor performance constituted a breach of her duty to Employer.

[14] The standard of review on appeal of a decision of the Board is threefold: (1) findings of basic fact are reviewed for substantial evidence; (2) findings of mixed questions of law and fact—ultimate facts—are reviewed for reasonableness; and (3) legal propositions are reviewed for correctness. *Recker v. Review Bd. of Ind. Dep't of Workforce Dev.*, 958 N.E.2d 1136, 1139 (Ind. 2011) (citing *McClain v. Review Bd. of Ind. Dep't of Workforce Dev.*, 693 N.E.2d 1314, 1318 (Ind. 1998), *reh'g denied*). Ultimate facts are facts that involve an inference or deduction

based on the findings of basic fact. *Id.* (citing *McClain*, 693 N.E.2d at 1317). Where such facts are within the special competence of the Board, this court will give greater deference to the Board's conclusions, broadening the scope of what can be considered reasonable. *Id.* (citing *McClain*, 693 N.E.2d at 1318).

[15] "Under the Unemployment Compensation System established by the General Assembly, an individual is disqualified from receiving benefits if discharged for just cause by the most recent employer." *Id.* at 1140 (citing Ind. Code § 22-4-15-1(a)).[1] Ind. Code § 22-4-15-1(d) delineates nine non-exclusive scenarios that can amount to "[d]ischarge for just cause," which include "any breach of duty in connection with work which is reasonably owed an employer by an employee." *Id.* "This basis for a just cause discharge does not explicitly condition a claimant's ineligibility on a requirement that the breach of duty must have been knowing, willful, or intentional." *Id.* The breach of duty

---

[1] Ind. Code § 22-4-15-1(a) provides:

> Regarding an individual's most recent separation from employment before filing an initial or additional claim for benefits, an individual who voluntarily left the employment without good cause in connection with the work or *was discharged from the employment for just cause* is ineligible for waiting period or benefit rights for the week in which the disqualifying separation occurred and until:
>
> (1)     the individual has earned remuneration in employment in at least eight (8) weeks; and
>
> (2)     the remuneration earned equals or exceeds the product of the weekly benefit amount multiplied by eight (8).
>
> If the qualification amount has not been earned at the expiration of an individual's benefit period, the unearned amount shall be carried forward to an extended benefit period or to the benefit period of a subsequent claim.

(Emphasis added).

"ground for just [cause] discharge is an amorphous one, without clearly ascertainable limits or definition, and with few rules governing its utilization." *Id.* (quoting *Hehr v. Review Bd. of Ind. Emp't. Sec. Div.*, 534 N.E.2d 1122, 1126 (Ind. Ct. App. 1989)).

> In considering whether an employer may utilize this provision as a basis for justifying its action, the Board should consider whether the conduct which is said to have been a breach of a duty reasonably owed to the employer is of such a nature that a reasonable employee of the employer would understand that the conduct in question was a violation of a duty owed the employer and that he would be subject to discharge for engaging in the activity or behavior.

*Id.* at 1140-1141 (quoting *Hehr*, 534 N.E.2d at 1126). "The duties reasonably owed to the employer by the employee may vary considerably depending on the circumstances." *P.K.E. v. Review Bd. of Ind. Dep't. of Workforce Dev.*, 942 N.E.2d 125, 132 (Ind. Ct. App. 2011), *trans. denied*.

[16] In addition, 646 Ind. Administrative Code 5-8-6(b) (filed Apr. 26, 2011) provides that a breach of duty reasonably owed to an employer includes, but is not limited to, conduct which establishes that the claimant (1) damaged the employer's trust and confidence in the claimant's ability to effectively perform the job; (2) willfully failed to meet the employer's reasonable expectation; (3) chose a course of action that the claimant knew, or should have known, would negatively impact the employer's financial interests; (4) demonstrated an intentional or substantial disregard for the employer's interests; (5) intentionally or knowingly injured, or attempted to injure, the employer's financial interests; (6) intentionally chose a course of action that pitted the claimant's interests

against the employer's interests to the detriment of the employer; or (7) showed carelessness or negligence to such a degree, or with such recurrence, as to cause damage to the employer's interests.

[17] The record reveals that Employer testified that Claimant repeatedly failed to complete certain job tasks and to enter patient insurance information into Employer's computer system correctly, that Employer received complaints from patients regarding incorrect bills, and that Claimant's performance resulted in harm to the business. Employer submitted several progress notes and other documents which reflected the various work-performance issues, and the fact these issues impacted revenue and expenses was discussed with Claimant. Claimant worked in the front office of a medical practice, and she had notice regarding the expectations of her position, including with respect to the accurate filing of insurance claims, the collection of payments, and the filing of patient information. These tasks were an intrinsic part of the work responsibilities of an employee in Claimant's position, and an employee "should reasonably expect a duty fundamental to the [employee's] job." *See Recker*, 958 N.E.2d at 1141.

[18] Under the circumstances, we conclude that Claimant showed carelessness or negligence to such a degree or with such recurrence as to cause damage to Employer's interest, breached a duty in connection with work which was reasonably owed Employer, and that Claimant's conduct was of such a nature that a reasonable employee of Employer would understand that the conduct was a violation of a duty owed Employer. *See Recker*, 958 N.E.2d at 1141

(noting that the ability to back up a truck was an intrinsic part of the work responsibilities of an employee in the claimant's position, that the claimant had notice that the inability to perform the task would be a violation of a duty owed to her employer, and that actual driving competence was an integral component of the claimant's duties); *Seabrook Dieckmann & Naville, Inc. v. Rev. Bd. of Ind. Dep't of Workforce Dev.*, 973 N.E.2d 647, 651-652 (Ind. Ct. App. 2012) (observing that the claimant's errors were continual and included preparation of funeral documents which contained misspellings, typographical errors, and misidentification of family members, concluding that claimant breached a duty in connection with work which was reasonably owed the employer and that the claimant's conduct was of such a nature that a reasonable employee of the employer would understand that the conduct was a violation of a duty owed the employer, and reversing the Board's decision that the claimant was not discharged for just cause) (citing *VanCleave v. Rev. Bd. of Ind. Emp. Sec. Div.*, 517 N.E.2d 1260, 1264 (Ind. Ct. App. 1988) (noting that the claimant persisted in a pattern of substandard work performance, including failures to complete an order, to timely turn in monies collected, and to correctly mark paperwork resulting in improper bills, and that there was sufficient evidence of a continuing disregard of the interests of the employer to outweigh the claimant's explanations of a few of his errors)). Also, the statements in the notes to Claimant thanking her for her contributions, especially when viewed together with the work-performance instructions contained in the notes, did not change the fact that Claimant had notice regarding the expectations of her position and the fact that the tasks were an intrinsic part of her work responsibilities.

[19]     To the extent the Board asserts that poor performance alone does not constitute a breach of duty, we have previously observed that, as the Indiana Supreme Court has made clear, there must also be evidence that the breach of duty was Claimant's fault. *See Conklin v. Rev. Bd. of Ind. Dep't of Workforce Dev.*, 966 N.E.2d 761, 765 (Ind. Ct. App. 2012) (noting that "despite language in *Recker* suggesting that a 'just cause' discharge determination for 'breach of duty' statutorily does not require any consideration of the willfulness of the employee's conduct," the Court "still deemed it necessary to address whether an employee's conduct was volitional and/or whether he or she exercised 'some control' over the circumstances leading to the discharge," that, "[a]s *Giovanoni* [*v. Rev. Bd. of Ind. Dep't of Workforce Dev.*, 927 N.E.2d 906 (Ind. 2010),[2]] and *Recker* both make clear, . . . there must also be evidence that this breach was Conklin's fault," and that "[i]n other words, the accident must have been the result of a 'volitional act' or circumstances over which Conklin exercised 'some control'") (citing *Recker*, 958 N.E.2d at 1142), *reh'g denied*. Here, Claimant's failure to enter patient insurance information into Employer's computer system correctly or perform other payment and filing functions as described in the record were matters over which Claimant had "some control." *See Recker*, 958 N.E.2d at 1142 (concluding that the claimant's "unsuccessful

---

[2] In *Giovanoni v. Rev. Bd. of Ind. Dep't of Workforce Dev.*, the stated reason for discharge, which was a violation of an employer attendance policy, statutorily required consideration of the employee's intent in violating the policy, and the Indiana Supreme Court stated that "'just cause' determinations, as they pertain to an employee's discharge, must be consistent with the legislative purpose underlying the Act—to provide financial assistance to an individual who had worked, was able and willing to work, but through *no fault of his or her own*, is temporarily without employment." 927 N.E.2d 906, 910 (Ind. 2010) (emphasis added).

attempts to properly back up a truck were matters over which [the claimant] had 'some control' under the *Giovanoni* analysis"); *cf. Conklin*, 966 N.E.2d at 765 (concluding that an unexplained, involuntary act of passing out while driving cannot be construed as a "volitional" act or a circumstance over which Conklin exercised "some control"). Based upon the record, we conclude Claimant was discharged for just cause. *See Recker*, 958 N.E.2d at 1140-1142.

## *Conclusion*

[20] For the foregoing reasons, we reverse the decision of the Board that Claimant was not discharged for just cause.

[21] Reversed.

Baker, J., and May, J., concur.